UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 05-29-B-W |
| THOMAS MICHAEL DAIGLE, | ) |
| | ) |
| Defendant. | ) |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Thomas Daigle is charged in a one count indictment with knowingly importing oxycodone into the United States. He has now moved to suppress all evidence obtained from him, including statements made subsequent to his arrest, on the grounds that the initial stop, detention and arrest violated his rights under the Fourth Amendment. Following an evidentiary hearing held on July 14, 2005, I now recommend that the court adopt the following proposed findings of fact and **DENY** the motion.

**Proposed Findings of Fact**

Thomas Chambers is a police officer with the Calais Police Department. His professional background in law enforcement includes at least nine years of prior experience, including significant work with the military police. At approximately 10:30 p.m. on March 5, 2005, he was patrolling Calais, alone in his marked police vehicle. The cruiser had a visible light bar on the roof and identification marks indicating its relationship to the City of Calais. The weather that night was unremarkable for a Maine winter night; the roads were clear, but snow remained in the woods and unplowed areas of the City. Chambers was monitoring traffic on the cruiser's radio when he received an

alert from a sensor on the Milltown Railroad trestle, a trestle crossing the border between Canada and the United States, but not an authorized port of entry designated for use by pedestrians to enter the United States. Calais police vehicles are equipped with the ability to receive notice that a sensor has been activated.

Both Chambers and Border Patrol agents in the area responded to the sensor alert by commencing to investigate the possibility that a pedestrian had illegally entered the United States. Chambers monitored the radio traffic occurring among the border patrol agents to ascertain what information had been discovered. He learned that Border Patrol Agent Les Miller had responded to the sensor alert and had visited the railroad trestle. Once there Agent Miller had followed footprints in the snow that headed toward Clark's Variety, a convenience store located a short way from the railroad trestle. Agent Miller broadcasted a description of the size nine tread print he was following, explaining that the treads of the suspect's shoes left distinctive, dime size holes in the snow. Officer Chambers was in the vicinity of Clark's Variety and observed a pedestrian standing near the roadway not far from the variety store (although not in view of the store). Chambers also observed a pickup truck located in the shoulder of the road on the opposite side of the street from the pedestrian. Officer Chambers testified that the truck appeared to be preparing to execute a u-turn but refrained from doing so. Officer Chambers pulled his cruiser alongside the road and exited to ask the pedestrian questions. Officer Chambers perceived that the truck contained two occupants. The driver of the truck drove away from the scene as Chambers pulled up to park on the same side of the road as the pedestrian.[1]

---

[1] The occupants of the truck were apprehended by another law enforcement officer and Officer Chambers shortly thereafter. (Chambers's Detailed Incident Report at 2-4, Gov't Ex. 3.)

Officer Chambers described the pedestrian as having the appearance of a "deer caught in the headlights" as the cruiser pulled up. Chambers also indicated that the pedestrian was standing in something of a "football stance," as though preparing to dart. I credit this testimony and find that the pedestrian's behavior was suspicious to Chambers. Chambers exited his cruiser about 30 feet away from the pedestrian and asked if he could talk with the pedestrian. The pedestrian non-verbally assented by approaching Chambers as Chambers approached him. Officer Chambers asked the pedestrian's name and the pedestrian responded that he was Thomas Daigle. Officer Chambers positively identified in court the defendant, Thomas Daigle, as the pedestrian whom he encountered that evening.

After obtaining the defendant's name, Officer Chambers asked him where he was coming from and the defendant responded, "Saint Stephen." Saint Stephen is a New Brunswick town located immediately across the St. Croix River from Calais. Officer Chambers then asked the defendant whether he had come across the trestle bridge. The defendant hesitated and responded in the negative. Officer Chambers considered the defendant's response to be evasive. During this encounter Officer Chambers observed that the defendant's pants were snow-covered beneath the knees although the roadway and the sidewalk along which he was traveling were plowed and largely free of snow. Officer Chambers then asked the defendant if he could see the bottom of the defendant's shoes. The defendant complied and Officer Chambers observed dime-sized nubs on the tread of one or both shoes. Officer Chambers asked the defendant to place his hands on the cruiser and patted him down for weapons. According to Officer Chambers, whose testimony I credit, he "felt a clump of what I believed to be pills in Daigle's front left

pants pocket,"[2] and the defendant then dropped his head and stated, "I'm fucked." (Chambers's Detailed Incident Report at 2, Gov't Ex. 3.) Chambers then asked the defendant what was in his pocket. According to Chambers, the defendant "admitted the pills were Oxycontin." (Id.) Chambers removed from the defendant's pocket 120-130 pills prior to the arrival of a border patrol agent. (Id.) After the pat down another Calais officer arrived at the scene and the defendant was handcuffed and informed that he was being detained for border patrol. Border Patrol Agent Mark Rogers appeared on the scene and assumed custody of the defendant and the pills within a matter of minutes.[3]

### Discussion

Daigle contends that Officer Chambers's decision to stop and question him violated his Fourth Amendment right to be free from unreasonable seizures. According to Daigle, Officer Chambers had no authority to investigate illegal border crossings and stopped and questioned him based on nothing more than a hunch. (Def.'s Mot. to Suppress, Docket No. 18, at 4.) Therefore, argues Daigle, all evidence obtained against him during the encounter must be suppressed as "fruit of the poisonous tree." (Id. at 5, citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).) The government responds that Officer Chambers's initial encounter with the defendant did not implicate the Fourth Amendment. (Gov't Response, Docket No. 21, at 3.) I agree with the government.

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in

---

[2]  The defendant has not argued that the manner in which Officer Chambers touched the bulge in his pocket constituted an unreasonable search.

[3]  Border Patrol Agent Mark Rogers testified that approximately 10 minutes transpired between the triggering of the alert from the bridge and the apprehension of the defendant.

> evidence in a criminal prosecution his voluntary answers to such questions.

Florida v. Royer, 460 U.S. 491, 497 (1983). The defendant voluntarily spoke with Officer Chambers and presented the sole of his shoe and, in the course of doing so, provided Officer Chambers with *probable cause* to believe that the defendant had illegally entered the United States without presenting himself for inspection at an appropriate border crossing. Because Officer Chambers had probable cause to believe that the defendant was the individual whom border patrol agents were seeking, he determined to hold the defendant for further questioning by border patrol agents, whom he understood to be within the immediate vicinity. Incident to this brief detention, Officer Chambers conducted a pat down for weapons to insure his safety, see Terry v. Ohio, 392 U.S. 1 (1968). It was during the pat down that Officer Chambers felt and asked about the bulge in the defendant's pocket and the defendant incriminated himself concerning the same.

During his oral presentation at the hearing, defense counsel focused his energies entirely on trying to undermine the justifications Officer Chambers gave for why he believed the defendant might be the individual who had crossed the trestle. However, in his written motion, the defendant also asserted an argument that Officer Chambers, a municipal police officer, lacked the authority to detain him because no federal or state statute provided Officer Chambers with authority to do so. If this argument is correct, then Officer Chambers was required to either keep the defendant voluntarily talking until a border patrol agent could arrive or else follow the defendant about until such time as a border patrol agent might apprehend him. The defendant's thinking appears to be that, if Officer Chambers had not patted the defendant down pursuant to the decision to detain

5

him, the defendant would have gone about his business and eluded border patrol (or perhaps lightened his load by some 120-130 pills before being apprehended).  This argument went unanswered in the government's written response to the defendant's motion and neither party addressed it during the hearing.

Despite how counter-intuitive the defendant's proposition sounds, there does not appear to be a ready made answer to it.  Federal law makes it clear that the Attorney General may enter into an agreement with a state or political subdivision that authorizes state, county or municipal law enforcement officers to engage in the "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," provided that the officer in question meets certain qualifications.  8 U.S.C. § 1357(g).  There is nothing in the existing record that indicates that the Attorney General has entered into such an agreement with the City of Calais.  Section 1357 also provides that the congressional authorization to enter into such an agreement is not to be deemed a requirement that an agreement be entered into "in order for any officer . . . to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  Id. § 1357(g)(10)(B).  Nevertheless, the government has not introduced a § 1357 agreement, and the question remains whether a positive source of law exists that authorized Officer Chambers to detain the defendant.  There is at least dicta to the effect that § 1357 evinces "a clear invitation from Congress" to state and local officers to assist in the detention of aliens, even if it does not authorize a state officer to arrest a person based solely on the fact that he is an illegal alien.  United States v. Vasquez-Alvarez, 176 F.3d 1294, 1300 (10th Cir. 1999).  There is also Supreme Court precedent to the effect that "in absence of an

6

applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." United States v. Di Re, 332 U.S. 581, 589 (1948).

Maine law extends authority to state law enforcement officers to make warrantless arrests based on probable cause to believe a person has committed or is committing, among other things, "[a]ny Class A, Class B or Class C crime," and also when a person "has committed or is committing in the officer's presence any Class D or Class E crime." 17-A M.R.S.A. § 15(1)(A)(2), (1)(B). The federal entry without inspection (hereinafter "EWI") offense exposes first time offenders to a fine imposed pursuant to Title 18 and/or imprisonment of not more than 6 months. 8 U.S.C. § 1325. Second time offenders face a fine and a maximum sentence of 18 months. Id. A first-time violation of this provision is classified under federal law as a Class B misdemeanor. 18 U.S.C. § 3559(a)(7); see also United States v. Rios-Cruz, 376 F.3d 303, 303-304 (5th Cir. 2004); United States v. Rodriguez-Gonzales, 358 F.3d 1156, 1159 (9th Cir. 2004). However, a second illegal entry after a prior conviction is a federal Class E felony. Rios-Cruz, 376 F.3d at 304; Rodriguez-Gonzales, 358 F.3d at 1159. Although the federal system of classifying offenses is not the same as the Maine system, it is apparent that the federal EWI offense is functionally equivalent to a state Class E or Class D offense, depending on whether it is a first offense or repeat offense. 17-A M.R.S.A. § 4-A (defining the class of "crimes which are outside this code," referring to the Maine Criminal Code). Thus, a Maine officer has authority under state law to make a warrantless arrest for an analogous state offense if it is committed in the officer's presence. 17-A M.R.S.A. § 15(1)(B). Pursuant to § 15(2) of Title 17-A:

> For the purposes of subsection 1, paragraph B, criminal conduct has been committed or is being committed in the presence of a law enforcement

> officer when one or more of the officer's senses afford that officer personal knowledge of facts that are sufficient to warrant a prudent and cautious law enforcement officer's belief that a Class D or Class E crime is being or has just been committed and that the person arrested has committed or is committing that Class D or Class E crime. An arrest made pursuant to subsection 1, paragraph B must be made at the time of the commission of the criminal conduct, or some part thereof, or within a reasonable time thereafter or upon fresh pursuit.

Based on the circumstances of this case, I conclude that Maine law authorized Officer Chambers to detain the defendant based on the totality of the information known to Officer Chambers because Chambers heard the initial alert, shortly thereafter had reason to believe that an EWI had "just been committed" by a pedestrian wearing shoes with a particular tread pattern and his pursuit of the pedestrian was commenced within a "reasonable time thereafter," likely even falling within the meaning of "fresh pursuit."

Finally, it bears reiterating that before Officer Chambers performed the pat down and placed the defendant in handcuffs, thereby implicating the Fourth Amendment, he had probable cause to believe that the defendant was the individual that the border patrol agents sought to apprehend.  Thus, even if Maine law did not authorize Officer Chambers to arrest the defendant for violation of federal immigration law, the existence of probable cause and the extremely limited duration of the detention make Officer Chambers's conduct reasonable from a Fourth Amendment perspective. See United States v. Janik, 723 F.2d 537, 548-49 (7th Cir. 1983) (addressing a somewhat similar circumstance and offering as an alternative holding that "even if the arrest was invalid under state law, the action of the state officers in arresting [the defendant] was not an 'unreasonable' seizure under the Fourth Amendment."); see also Michigan v. Summers, 452 U.S. 692, 699-700 & n.12 (1981) ("[T]he exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention

8

accompanied by a frisk for weapons . . . ."); United States v. Stewart, 388 F.3d 1079, 1084 (7th Cir. 2004) ("The permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars."); and compare Dunaway v. New York, 442 U.S. 200, 206-207 (1979) (holding that probable cause was required before detaining a suspect, transporting him to the station and subjecting him to custodial interrogation).  It appears quite clear that Officer Chambers followed precisely the most prudent course in securing and detaining the defendant for the brief amount of time required for a border patrol agent to arrive.

## Conclusion

For the reasons set forth above, I **RECOMMEND** that the court **DENY** the defendant's motion to suppress (Docket No. 18).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  July 19, 2005